WELCH & SMITH, P.C.

LAWYERS
6440 AVONDALE DRIVE
SUITE 206
OKLAHOMA CITY, OK 73116
TELEPHONE: (405) 286-0801
FACSIMILE: (405) 286-0301
E-MAIL: WS@WELCHSMITH.COM

MORT G. WELCH
MWELCH@WELCHSMITH.COM

SHERRY L. SMITH
SSMITH@WELCHSMITH.COM

July 11, 2013

Via Regular Mail and E-Mail

Mr. Roger N. Butler, Jr.
Secrest, Hill & Butler
7134 South Yale
Suite 900
Tulsa, OK 74136-6342

RE:   *SRM, Inc. v. Great American Insurance Company*
Case No. 11-CV-1090-F, United States District Court for the Western District
of Oklahoma

Dear Mr. Butler:

This report is submitted pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), in my

capacity as an expert witness for your client, the defendant Great American Insurance

Company, referred to in this report as GAIC. I will refer to the plaintiff as SRM, an

acronym for its original name, Schwarz Ready Mix, Inc. I refer to Bituminous Casualty

Company as BCC, and Union Pacific Railroad Company as UP.

I.   Education.

I received a bachelor of arts degree with special distinction from the University of

Oklahoma in 1972. I received a juris doctorate degree from the University of Texas

School of Law in 1975.

# EXHIBIT 5 (Part 1 of 2)

July 11, 2013
Page 2

## II. Experience And Qualifications.

I have been continuously engaged in the practice of law, almost exclusively in civil law matters since 1975. I was employed in 1975 and 1976 by a general practice law firm, Johnson and Davis, in Harlingen, Texas. From 1976 to 1978, I was an associate with Cooper, Stewart, Elder and Abowitz, in Oklahoma City, a civil litigation firm which handled many cases involving bodily injury tort and insurance claims. In 1978 I was a founder of Abowitz and Welch, and was a shareholder in this law firm, later known as Abowitz, Welch and Rhodes, until 1995. In 1995, I was a sole practitioner. In 1996 I formed another law firm, Welch, Jones & Smith, with Laurie W. Jones and Sherry L. Smith. In 2000 this firm became Welch and Smith, when Ms. Jones became a full-time teacher at the Oklahoma City University School of Law.

My practice since 1976 has consisted of civil litigation of all types, including insurance coverage and insurance bad faith cases, and advising insurers, insureds, lawyers and public adjusters concerning rights and obligations under insurance policies. This advice has resulted in the preparation of over a thousand written opinions concerning a wide variety of issues arising as a result of claims made under insurance policies. I have reviewed and approved preparation of numerous insurance coverage opinions by other lawyers. I have also prosecuted and defended multiple insurance bad faith, declaratory judgment and breach of insurance contract claims under a wide variety of policies, and for primary and excess insurers and insureds.

July 11, 2013
Page 3

My experience in insurance litigation and as an advisor to insurers, insureds, lawyers and public adjusters has involved issues under all of the coverage parts of umbrella and excess liability insurance policies, workers compensation and employer liability policies, motor carrier policies, personal and business auto policies, homeowners and farmowners policies; professional liability policies; directors and officers liability and corporate indemnification policies; commercial general liability and property coverage forms; and reinsurance contracts. I have drafted insurance policy provisions and revised other provisions. I have personally supervised hundreds of investigations of claims, including claims under commercial excess and umbrella, and personal umbrella policies, and personally conducted such investigations. I have trained adjusters and their supervisors concerning claims investigation techniques and procedures, the construction and interpretation of insurance policies, insurance case and statutory law, evaluation of bodily injury claims, and standards for claims handling intended to comply with the covenant of good faith and fair dealing. I have evaluated thousands of claim files for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages, and whether the investigation and handling of the claim is consistent with the obligation of good faith and fair dealing. This specifically includes many claim files for claims made under excess or umbrella policies or a combination of both.

Cases resulting in published trial or appellate court opinions in which I was either trial or appellate counsel include the following: Akin v. Ashland Chem. Co., 156 F.3d 1030

(10th Cir. 1998) *cert. den'd* 526 U.S. 1112 (1994); Alea London Ltd. v. Canal Club, Inc.,
231 P.3d 157 (Okla. Civ. App. 2009); Allstate Ins. Co. v. Fox, 139 F.3d 911 (Tab.), 1998
WL 77745 (10th Cir. 1998); American Farmers & Ranchers Mut. Ins. Co. v. Shelter Mut.
Ins. Co., 267 P.3d 147 (Okla. Civ. App. 2011); American Interstate Ins. Co. v. Wilson
Paving & Excavating, Inc., 2009 WL 3427992 (N.D. Okla. Oct. 20, 2009); Angelo v.
Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Beeman v. Manville Corp.
Asbestos Disease Compensation Fund, 496 N.W.2d 247 (Iowa 1983); Bristol v. Fibreboard
Corp., 789 F.2d 846 (10th Cir. 1986); Case v. Fibreboard Corp., 1987 OK 79, 743 P.2d
1062; Cofer v. Morton, 784 P.2d 67 (Okla. 1989); Coleman v. Turpen, 697 F.2d 1341 (10th
Cir. 1982), *app. after remand*, 827 F.2d 667 (10th Cir. 1987); Condray v. Unum Life Ins.
Co. of Am., 2009 WL 1312515 (W.D. Okla. May 7, 2009); Employers Ins. Co. of Wausau
v. Midwest Towers, Inc., 2011 WL 5117610 (W.D. Okla. Oct. 25, 2011); First Financial
Ins. Co. v. Roach, 80 F.3d 420 (10th Cir. 1996); Fisher v. Owens Corning Fiberglass Corp.,
868 F.2d 1175 (10th Cir. 1989); Fleming v. Hall, 638 P.2d 1115 (Okla. 1981); Gonzalez v.
Dub Ross Co., Inc., 224 P.3d 1283, (Okla. Civ. App. 2009); Grain Dealers Mut. Ins. Co. v.
Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002); GuideOne Mutual Ins. Co.
v. The Shore Ins. Agy., 259 P.3d 864 (Okla. Civ. App. 2011); Horace Mann Ins. Co. v.
Johnson, 953 F.2d 575 (10th Cir. 1991); Huff v. Fibreboard Corp., 836 F.2d 473 (10th Cir.
1987); Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760 (Okla. 1995); Lindsey v.
Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979), *cert. den'd.* 444 U.S. 856 (1979);
Livengood v. Thetford, 681 F.Supp. 695 (W.D. Okla. 1988); Mulford v. Neal, 264 P.3d
1173 (Okla. 2011); Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co., 967
P.2d 479 (Okla. Civ. App. 1998); Republic Underwriters Ins. Co. v. Moore, 2010 WL

4365566 (N.D. Okla. 2010) *rev'd* 2012 WL 2948177 (10th Cir. 2012); Sargent v. Central Nat'l Bank & Trust Co. of Enid, Oklahoma, 809 P.2d 1298 (Okla. 1991); Short v. Oklahoma Farmers Union, 619 P.2d 588 (Okla. 1980); Snethen v. Oklahoma State Union of the Farmers' Edu. and Coop. Union of Am., 664 P.2d 377 (Okla. 1983); State Farm Mut. Ins. Co. v. Schwartz, 933 F.2d 848 (10th Cir. 1991) (amicus curiae); Takagi v. Wilson Foods Corp., 662 P.2d 308 (Okla. 1983); Tax Investments Concepts Inc. v. McLaughlin, 670 P.2d 981 (Okla. 1982); Thiry v. Armstrong World Industries, Inc., 661 P.2d 515 (Okla. 1983); Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335 (10th Cir. 1995); Trinity Univ. Ins. Co. v. Broussard, 932 F.Supp. 1307 (N.D. Okla. 1996); Vilseck v. Fibreboard Corp., 861 S.W.2d 659 (Mo. App. 1993); Wever v. State ex rel. Dept. of Human Serv., 839 P.2d 672 (Okla. Civ. App. 1990); Wilson and Co. v. Reed, 603 P.2d 1172 (Okla. Civ. App. 1979); Wilson Foods Corp. v. Noble, 613 P.2d 485 (Okla. Civ. App. 1980); and Wilson Foods Corp. v. Porter, 612 P.2d 261 (Okla. 1980).

I participated in drafting the anti-stacking provisions of auto uninsured motorist coverage subsequently upheld by the Oklahoma appellate courts in Withrow v. Pickard, 905 P.2d 800 (Okla. 1995); Breakfield v. Oklahoma Farmers Union Mut. Ins. Co., 910 P.2d 991 (Okla. 1995); and Kinder v. Oklahoma Farmers Union Mut. Ins. Co., 943 P.2d 617 (Okla. Civ. App. 1997). I have drafted and revised many other types of clauses for use in various insurance policies, including insurance agents professional liability, umbrella/excess liability, commercial general liability, commercial property, auto, homeowners, farmowners, and dwelling policies, I have prepared drafts of entire business and personal auto policies.

I was a member of the State Bar of Texas from 1975 when first admitted to practice law and continuing for a few years until I discontinued my membership after deciding to stay in my home state of Oklahoma. I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in the United States District Courts for the Western and Northern Districts, and previously was admitted in the Eastern District of Oklahoma as well[2], the Tenth Circuit Court of Appeals, and the United States Supreme Court. I have also been admitted to practice *pro hac vice* in several state and federal trial and appellate courts in Arkansas, Kansas, Missouri, Illinois, Arizona, Pennsylvania, California, New Jersey, New Mexico, Ohio and Texas. I have also been admitted *pro hac vice* before the Supreme Court of Iowa, and the Missouri, Illinois and Kansas intermediate appellate courts.

I am a member of the International Association of Defense Counsel, the American Bar Association, its Tort and Insurance Practice Section, and the Defense Research Institute. I was for many years a member of the Oklahoma Association of Defense Counsel. I was selected for inclusion in *SuperLawyers* in insurance coverage for the years 2009, 2010, 2011 and 2012, for the State of Oklahoma.

I have lectured and prepared seminar materials for continuing legal education programs sponsored by Oklahoma Bar Association, Oklahoma Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law. These

presentations have been approved as continuing education programs for Oklahoma lawyers, Oklahoma, Texas and California adjusters, and Oklahoma insurance agents. Selected titles include: *Allocation of Fault-Identifying All Angles*, OBA CLE (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA CLE (Feb. 1990); *Documenting the Agreement*, OBA CLE (Dec. 1991 and Mar. 1995); *Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.*; The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA & Oklahoma Insurance Department approved CE (Oct. 2009); *Substantial Certainty Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know*, 11th Annual Spring Insurance Update Seminar (April, 2010, Oklahoma City/Dallas), an Oklahoma Insurance Department approved CE; and *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit*, Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010). I was program planner and moderator for the OBA and Oklahoma Insurance Department approved CE seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).

I have presented client positions on insurance coverage issues to the Oklahoma Insurance Department and advised that department informally on insurance coverage issues. I have participated in drafting proposed legislation relating to insurance in

Oklahoma and Idaho. This includes bills in various sessions of the Oklahoma legislature to amend the Oklahoma Declaratory Judgment Act, 12 O.S. §1651, to permit declaratory judgments concerning issues arising under liability insurance policies. The Act was amended, effective November 1, 2004, to bring Oklahoma into line with the vast majority of the states, by permitting liability insurance policy declaratory judgment actions. The courts subsequently recognized this change. *See*, Knight v. Miller, 195 P.3d 372 (Okla. 2008); Equity Ins. Co. v. Garrett, 178 P.3d 211 (Okla. Civ. App. 2008); and Automax Hyundai South v. Zurich Am. Ins. Co., ___ F.3d ___, 2013 WL 3198603 at *9 n.3 (10th Cir. June 16, 2013). I also participated in the revision of the motor vehicle insurance laws in Title 47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular session of the 2009 Legislature.

I am an adjunct professor at the Oklahoma City University School of Law, currently teaching Texas Civil Procedure.

## III. Prior Testimony.

I have testified by deposition as an expert witness in the following insurance cases:

Allen v. Lynn Hickey Dodge, No. CJ-96-6076, District Court of Oklahoma County, Oklahoma, on February 7, 2003 for the plaintiffs and their attorney, Ed Abel; Anders v. GEICO, No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, on September 18 and September 19, 2003 for the defendant GEICO and its attorney, Jerry Pignato; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa

County, Oklahoma, on June 3, 2004 for the defendant, Mid-Continent Casualty Co. and its attorney, Roger Butler; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, on October 28, 2004 for the defendants and their attorney, Joe E. White, Jr.; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma on November 16, 2005 for the defendant and its attorney, David Donchin; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, on October 10, 2002 for the defendant GEICO and its attorney, Robert Allen, then with Baker and McKenzie; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburgh County, Oklahoma for the defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley; Melton Truck Lines Inc. v. Indemnity Ins. Co. of North America, No. CV-263-JHP-SHA, Northern District of Oklahoma, on August 2, 2007 for the defendant and its attorney, Robert Rivera, Jr. of Susman, Godfrey LLP; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, on September 8, 2005 for the defendant and its attorney, David Donchin; Cordova v. Oklahoma Farm Bureau Ins. Co., No. CJ-2008-1557, District Court of Oklahoma County on November 16, 2009 for plaintiff and her attorney Gregg W. Luther of West Law Firm; Cearley v. Great American Ins. Co. of New York, No. CJ-2008-1202, District Court of Creek County on January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer, Steidley & Neal; Tate v. Allstate Ins. Co., Case No. 10-CV-104-R, United States District Court, Western District of Oklahoma on February 16, 2011, for the plaintiff and his attorney, Gregg W. Luther of West Law Firm; Sherwood Construction Company, Inc. v. American Home Assurance

Company, et al., Case No. 5:09-cv-1395-HE, United States District Court for the Western District of Oklahoma on April 13, 2011, for the defendants and their attorneys, Elizabeth E. Muckala and Linda M. Szuhy of Thompson, Coe, Cousins & Irons; David Gregory Miller v. Farmers Ins. Grp., et al., Case No. CIV-10-466-F, United States District Court for the Western District of Oklahoma, on July 8, 2011, for the plaintiff and his attorneys Logan Johnson and Brad Miller, of Durbin, Larimore & Bialik; Steven Hayes v. State Farm Fire & Casualty Co., Case No. 10-CV-680-HE, United States District Court for the Western District of Oklahoma, on September 13, 2011, for plaintiff Steven Hayes and his attorney Rachel Bussett of Bussett Law Firm; and Janet McDonald v. American General Life Ins. Co., Case No. 12-CV-0012-D, United States District Court for the Western District of Oklahoma, on September 28, 2012, for plaintiff Janet McDonald and her attorney Patrick Ryan of Ryan, Whaley, Coldiron, Shandy, PC.

I have testified at trial as an expert witness in the following insurance bad faith cases:

Anders v. GEICO; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.; Tate v. Allstate Ins. Co.; David Gregory Miller v. Farmers Ins. Grp., et al. (hearing on class certification); and Nelson v. Granite States Ins. Co., Case No. CIV-08-1165, United States District Court for the Western District of Oklahoma.

In Gutkowski, Hutchinson, and Ward, my expert opinions were offered on behalf of the client I represented, and not as a retained expert.

I testified as an expert witness by deposition for the defendants and their attorney, James K. Secrest II, in a legal malpractice case, Wheat v. Richardson, No. CJ-2007-7248, District Court of Tulsa County, Oklahoma on October 13, 2009 and for the plaintiff and its attorney, Robert Killeen, in another legal malpractice case, Gray Ins. Co. v. Heggy, No. 11-CV-733-C, United States District Court for the Western District of Oklahoma, by deposition on October 10, 2012.

### IV. Compensation.

I am charging your firm $295.00 per hour for my services as an expert witness on behalf of your client in this case.

### V. Documents Reviewed.

I have reviewed the following:

1. Pleadings, motions, briefs, exhibits to motions and briefs, discovery responses, and documents produced in the case referenced above;

2. The entire court file for the case of Troy Smith et al. v. Schwarz Ready Mix, Inc. et al, Case No. CJ-2006-147, District Court of Canadian County, Oklahoma (herein *Smith v. SRM*);

3. GAIC claim file for *Smith v. SRM*;

4. Commercial Auto Policy CAP3501293 issued by BCC to SRM and related entities;

5. Commercial Umbrella Policy TUU6-62-76-61-02, issued by GAIC to SRM and related entities;

6. Deposition of Mike McAtee and exhibits thereto;

7. Insurance industry publications, statutes, case law, secondary legal resources and encyclopedias, much of which is identified in this report.

If I am furnished additional documents, depositions or other sources of information after the date of this report, I reserve the right to supplement this report.

## VI. Exhibits.

I have not determined which exhibits will be used in the trial of this case in connection with my testimony. At the present time I anticipate using portions of the Commercial Auto Policy and Commercial Umbrella Policy, and various pleadings, motions and briefs filed in *Smith v. SRM*.

## VII. Factual Overview

This section identifies what appears to be the factual basis for the bad faith claim made in this case, including the nature of the underlying lawsuit in the District Court of Canadian County, Oklahoma, styled *Troy Smith et al. v. Schwarz Ready Mix, Inc. et al,*

Case No. CJ-2006-147 (herein *Smith v. SRM*), the response of SRM's insurers, BCC and GAIC, and the response of the defendant, SRM, to that case.

## A. History of *Smith v. SRM.*

This case originated in a dump truck/train collision at a railroad crossing in the City of Yukon on March 7, 2006. Joel Phillips, an employee of SRM, was engaged in that employment while driving a SRM dump truck southbound on Richland Road. A Union Pacific (UP) train was traveling eastbound approaching the Richland Road crossing. For reasons unknown Phillips did not stop at the crossing and a collision occurred between the lead engine and the dump truck. Phillips was killed in the collision. Three UP employees in the engine of the train, the plaintiffs Troy Smith, Albert Guerrero, and Steve Ramsey, were taken to a local hospital for examination and treatment. The dump truck, engines, open cars attached to the engines, contents of the cars, and railroad track all were damaged.

A week after the collision, on March 14, 2006, the UP employees filed *Smith v. SRM.* The trainmen alleged they could recover damages from SRM based upon the negligent driving of Phillips, and also for the negligent hiring, retention and training of Phillips, as well as the negligent entrustment of its dump truck to Phillips. Plaintiffs also alleged they were entitled to recover damages from their employer, UP, under the Federal Employers Liability Act (FELA). The Second Amended Petition filed April 17, 2006 appears to have corrected an inadvertent omission of plaintiff Ramsey from the FELA claim against UP.

At the time of the collision, SRM had two insurance policies which provided liability coverage for claims arising out of the collision. The first, a Commercial Auto Policy issued by BCC, had a single per accident limit of insurance of $1 million. This means that, regardless of how many people are injured or killed or how much property damage is sustained, and by how many people, the maximum amount of insurance is $1 million.[3] The second policy, entitled a Commercial Umbrella Policy, was issued by GAIC with a $5 million per occurrence and aggregate limit of insurance, meaning that $5 million is the total amount of insurance for all damages arising out of one or more occurrences during a policy period.[4] Becky Hopkins was the Oklahoma City adjuster assigned by BCC to investigate the claims, supervised by Kelly Grammer, also in Oklahoma City and Ellen F. Biondo was the claim representative assigned by GAIC.[5]

SRM gave notice to both BCC and GAIC of *Smith v. SRM*. Pursuant to the defense clause in the Commercial Auto Policy (GAIC 0117, § II.A of the BUSINESS AUTO COVERAGE FORM of the policy), BCC appointed John McKechnie to represent SRM at BCC's expense. GAIC notified SRM it would monitor the case to determine if, based on the liability and damages, the case could reasonably have a value exceeding the $1 million limit of insurance in the BCC policy.[6] From the documents I reviewed, it does not appear

---

[3] *See,* GAIC 0054, Declarations to Commercial Auto Policy CAP3501293, issued by BCC in the name of Schwarz Ready Mix, Inc. and related entities.
[4] *See,* GAIC 0001, Declarations to Commercial Umbrella Policy TUU6-62-76-61-02.
[5] GAIC 0220-0222, March 21, 2006 claim note by Biondo, the GAIC adjuster to whom the claim was assigned after the first couple of weeks. See GAIC 0225, March 15, 2006 Biondo claim note.
[6] March 8, 2006 Pine-G.Schwarz letter, GAIC 0481.
[8] *See e.g.,* leading cases on this preemption doctrine, CSX Transp., Inc. v. Easterwood, 507 U.S. 658 (1993) and Norfolk Southern Rwy. Co. v. Shanklin, 529 U.S. 344 (2000).

that either insurer identified a coverage issue that might render either of the policies inapplicable to the claims in *Smith v. SRM*.

Mike McAtee, an experienced Oklahoma City defense lawyer, was SRM's personal lawyer for several years standing before the truck/train wreck, and represented SRM in *Smith v. SRM* as well. From my review of the GAIC claim file (to be discussed), the court file in *Smith v. SRM*, documents produced at Mr. McAtee's deposition, as well as his deposition testimony, it is clear that Mr. McAtee was actively engaged in the defense of SRM in the case. This was entirely proper, given even the early indications concerning possible damages and, unbeknownst to the insurers, SRM's pending sale to an Australian company.

McKechnie and McAtee jointly filed an answer to the petitions and a crossclaim against UP for (1) contribution in the event SRM was required to pay more than its pro rata share of the plaintiffs' damages, pursuant to 12 O.S. § 832, and (2) for damages to the SRM dump truck. The basis of UP's liability was alleged to be a failure to install suitable signs and signals at the Richland railroad crossing (later clarified to mean blinking lights and an automatic gate instead of just the existing two cross bucks).

On April 25, 2006 UP filed an answer to the FELA claim and to SRM's crossclaim. UP also asserted a crossclaim against SRM for damages to its engine and open car, the contents of the cars, the railroad tracks, and incidental items. Because SRM had filed a certificate of insurance with the Oklahoma Corporation Commission to obtain authority to

operate as a common carrier in Oklahoma, showing BCC as the insurer, UP added BCC as a third party defendant being jointly liable with SRM. In a Third Amended Petition filed March 5, 2007 the plaintiffs also asserted a claim against BCC, as jointly liable with SRM.

In its answer to SRM's crossclaim, UP affirmatively alleged that the ground of negligence relied upon in the crossclaim, the absence of proper signs and signals, was preempted by federal law. As the preemption issue was subsequently developed, UP asserted that, since the Richland crossing had improvements installed which were paid for in large part by the federal government, the cross bucks which were in fact in place were, as a matter of federal law, adequate, thereby precluding a negligence theory against UP based on a failure to comply with state laws governing warnings and signals at railroad crossings.[8]

An initial status conference was held before the assigned (and very experienced) district judge, Ed Cunningham, on July 28, 2006, scheduling a pretrial conference and discovery deadline for May 14, 2007, and a trial for June 4, 2007. On January 5, 2007 Amanda Phillips, the daughter of Joel Phillips, the SRM truck driver, in her capacity as personal representative of her father's estate, filed a Petition In Intervention against UP. Phillips sought to recover for her father's death, on the basis that UP was negligent for having inadequate signs and signals at the crossing. On February 23, 2007 UP answered the Petition In Intervention, and counterclaimed against the Phillips estate for contribution and its property damage, the same elements of damages which were the subject of UP's crossclaim against SRM.

Also, on February 23, 2007 UP filed a motion for partial summary judgment on the preemption issue, to which the other parties, including SRM and Phillips, responded. The arguments against the motion essentially were that UP had failed to prove that federal funds were used to install equipment at the Richland crossing. Several affidavits and depositions were ultimately submitted on this precise issue. Although Judge Cunningham, at the initial hearing on the motion, indicated an inclination to grant it, he allowed SRM additional time to obtain more evidence. Ultimately, the preemption motion was not ruled upon before the case was settled.

On June 12, 2007 a second scheduling order was entered, scheduling a pretrial conference and discovery deadline for September 24, 2007 with an October 2007 trial date. On June 7, 2007, Kevin Taylor and his associates with Snell and Wilmer in Denver, moved to appear pro hac vice for SRM, and were granted this status. On June 18, 2007 Amanda Phillips dismissed her Petition In Intervention against UP with prejudice, pursuant to a settlement, the terms of which I do not know. On August 30, 2007 a mediation was held before John Rothman. The claims of the plaintiffs and UP's crossclaim for property damage were not settled at the mediation. However, on September 5, 2007 those claims did settle and the case later was dismissed.

## B. Review of the GAIC Claim File, Mike McAtee Deposition, And Exhibits Thereto.

The initial claims representative assigned by GAIC to *Smith v. SRM* garnered basic information about the accident. When the claim was reassigned to Ellen Biondo, the person doing the reassignment (JS) said "damages likely to exceed U/L [underlying] coverage" (GAIC 0225, March 15, 2006 claim file note). On March 21, 2006 Biondo reviewed the limited information in the file and talked to Becky Hopkins, the adjuster assigned by BCC to the case. This is standard operating procedure for an excess insurer which is not defending a case. A major source of information for the excess insurer is the primary insurer. The primary insurer has the contractual obligation to defend the insured, and also has a financial incentive to keep the excess insurer up-to-date because Oklahoma law, as well as the law in most states, recognizes that an excess insurer which is required to pay on a claim which, in good faith, should have been settled by the primary insurer, can recover its payment from the primary insurer on a theory of subrogation.[9]

According to Hopkins, the Oklahoma Highway Patrol had already determined that the train blew its whistle at the required distance from the crossing and was not speeding when it entered the crossing, but that there was a "very complicated" issue concerning whether SRM could pursue its inadequate signaling/warning theory against UP (GAIC 0220, Biondo claim note). Hopkins also informed Biondo that SRM, with business locations in Yukon and surrounding areas, had a good reputation in Canadian County and, according to appointed counsel (McKechnie), the jury pool would be conservative (*Id.*).

---

[9] *See e.g.*, American Fid. & Cas. Co. v. All American Bus Lines, Inc., 190 F.2d 234 (10th Cir. 1951); St. Paul-Mercury Indem. Co. v. Martin, 190 F.2d 455 (10th Cir. 1951) (both applying Okla. law).

Biondo's initial review of the file notes the train engineer, plaintiff Smith, had a back injury but the other two plaintiffs appeared to have only cuts and abrasions (GAIC 0220). This view was corroborated by Biondo's conversation with McKechnie on May 1, 2006. He told Biondo, according to her note, that the plaintiffs' claims appear "to be less serious than originally thought" (GAIC 0217). It was also standard and proper operating procedure for Biondo, on behalf of the excess insurer, to obtain information from the lawyer appointed by the primary insurer to represent the common insured. Given that an excess insurer is not contractually obligated under the policy to defend an insured, until such time as the primary policy's limit of insurance is exhausted (to be discussed in the next section), the excess insurer must have the cooperation of the primary insurer and its appointed counsel in order to be properly informed about a case which, ultimately, may present a claim which is legitimately within the limits of insurance of the excess policy.

Biondo's notes also reiterate that Hopkins had informed her that SRM's driver had good visibility but, possibly due to the lack of gates or warnings, there "may be some liability questions". The questions would be (1) does federal preemption preclude holding UP liable for failure to install warning lights and an automatic gate in addition to the existing two cross bucks; (2) if preemption does not apply, will the jury find UP negligent for failing to install this equipment; (3) if UP was found negligent, what percentage of negligence will a jury assign for failing to install such equipment; and (4) was UP's negligence at least a contributing proximate cause of the plaintiffs' injuries, UP's own property damage, Phillips' death, and SRM's property damage.

July 11, 2013
Page 20

On June 19, 2006 McKechnie discussed with Biondo the meeting he had had with representatives of SRM, and advised her he was awaiting discovery responses from UP which would provide information on its property damage claim and identify who installed the equipment at the Richland Crossing. McKechnie also expressed the opinion, according to Biondo's note, that it was "hard to imagine" UP's claim would be less than $1 million (GAIC 0213-0214). On the same date Biondo successfully requested the initial reserve on the case be changed to $595 (which appears to be a symbol for a claim which may exceed the limit of insurance of the primary policy) (GAIC 0212-0211).

The first comprehensive report which Biondo (and apparently BCC) received from McKechnie was dated July 20, 2006, addressed to Kelly Grammer of BCC, and copied to Biondo and SRM's personal attorney, McAtee (GAIC 1256-1260). The report reflects that Phillips had already made four trips to R&M Resources on the morning of the accident, located just north of the railroad crossing where the accident happened, to get loads of sand. His route took him across the railroad tracks on Richland Road each trip. As McKechnie aptly observed, "Phillips had to have been thoroughly familiar with this crossing" (GAIC 0217).

According to the Oklahoma Highway Patrol, as related by McKechnie's report, the plaintiffs had said that Phillips never stopped and kept moving "at an ordinary, unremarkable speed onto the tracks". There were no apparent skid marks. Phillips had a completely wide open view, and McKechnie had not uncovered any evidence to prove that

the train's headlight was not on, that the whistle was not blowing for approximately a quarter mile in advance of the crossing, or that the train was traveling at a speed in excess of the railroad's speed limit of 49 mph (the speed turned out to be about 46 mph). Moreover, according to McKechnie "UP [and plaintiffs] had favorable evidence on all these subjects".

Given these facts, it is hardly surprising McKechnie characterized the lack of lights and automatic gate at the crossing as "[o]ur only substantive liability defense" (GAIC 1257) which, as he properly pointed out, might be preempted. McKechnie at this early stage put the odds of SRM being held liable to the plaintiffs and UP, if preemption applied, at "95%-100%" (GAIC 1258). Without preemption he posited a "best case of 50 to 100%", with it being "a complete victory" if the jury assessed UP to be 15-20% negligent. However, later in the report McKechnie stated "it would be a major achievement to put 50% fault on UP" (GAIC 1260). McKechnie also estimated the plaintiffs might not be held contributorily negligent but might be held contributorily negligent up to 10%, but "[w]e must assume for now the jury will put 0% on the plaintiffs".

McKechnie's July 20, 2006 report also evaluated damages. Despite having informed Biondo in March that the plaintiffs did not apparently have as serious injuries as initially assumed, he states "[t]he trainmen were seriously injured". But then he states "[w]e have just received the medical records and are busy reviewing them", indicating that whatever the basis of his opinion, it was not a thorough review of the medical records. As for UP's crossclaim, McKechnie had not received any documentation of the damages, which

appears to have a common label of "bill of costs". Purely as a "rank guesstimate", but also as "our best preliminary estimate", McKechnie opined damages in total could be $4.2 million, $2.5 million for the plaintiffs, and $1.7 million for UP on its property damage claim (GAIC 1259).

At the point of the July 20, 2006 letter, as it notes, no depositions had been taken but McKechnie stated plans included deposing the plaintiffs, treating doctors, and plaintiffs' and UP's experts, as well as retaining an accident reconstructionist, "signalization" expert, two or three experts on UP's property damages, an economist and vocational rehabilitation specialist to assess loss of income and future earning capacity damages of the plaintiffs. It does appear, however, at this early stage that BCC had authorized McKechnie to retain a train damage expert by the name of Nelson. As things turned out, when the mediation started on August 30, 2007, and when the case finally settled on September 5, 2007, the treating doctors had not been deposed, one of the plaintiffs experts had not been deposed, no vocational rehabilitation expert had been retained, and, although an economist had been retained, he had not yet provided a report. As will be shown later, at the time of the mediation the plaintiffs also had not been examined by a physician of SRM's choice, although an examination was scheduled one week prior to the mediation which had to be aborted for reasons which will be discussed.

Based on McKechnie's July 20, 2006 report Biondo prepared her "six month strategy report" on September 7, 2006. On October 4, 2006 "Tom" commented on McKechnie's report, stating: "While counsel does a lot of speculating on damages, there's foundation for

July 11, 2013
Page 23

his estimated $4.2 M. Even taking 50% (which I believe is overly optimistic) we're well into our layer" (GAIC 0207). "Tom" instructed Biondo to contact BCC to see if it had more information on the damages of the plaintiffs and UP. Biondo in turn contacted Hopkins at BCC but was informed that she had not received any more information on damages but, according to McKechnie, he "should have discovery from UP this week" (GAIC 0204). As of November 2, 2006 the GAIC reserve was set at $1 million.

As of January 16, 2007 Biondo had not received any additional information regarding damages, but McKechnie had advised a "report being sent" and he had "recently" received additional unspecified discovery responses. He also advised he "expect[s] UP final damage report in near future" (GAIC 0197). As of this date, the trial was still scheduled for June 4, 2007 (GAIC 0196). Biondo's March 14, 2007 note indicates she left a voicemail for Hopkins of BCC with the advice she had still not received any update on damages (GAIC 0194).

On March 26, 2007 Biondo reported that a hearing on UP's preemption motion was set for April 27, the plaintiffs had been deposed, SRM's representatives were deposed on March 23 and on March 26, and a train damage expert had been retained (GAIC 0192). As of April 5, 2007 Biondo was informed that the trial date had been moved to October 1, 2007 (GAIC 0191).

On April 5, 2007 Biondo and Kelly Grammer of BCC received a demand letter via email from Mike McAtee on behalf of SRM, demanding the insurers tender their combined

limits of insurance, $6 million, to the plaintiffs and UP, within the next ten days (GAIC 0376). Despite this demand, the letter goes on to say "[e]ven with a six million dollar tender it is going to be difficult to settle this case for that amount of money. If you wait six months to make the tender, or even two months, it will be impossible to settle the case for $6 million". No facts supporting this conclusion are identified in the letter. In fact, neither GAIC nor BCC had received any information that the plaintiffs or UP had made a demand for settlement, whether within the combined limits of the policies or for more money than the insurance limits of the policies.

Mr. McAtee's April 5, 2007 letter does refer to an unidentified document which UP's lawyer had shown him at a hearing (but apparently did not give him), supposedly demonstrating property damages in excess of $2 million. The letter also stated the value of plaintiffs' bodily injury claims, after Mr. McAtee had attended their depositions in February, exceeded the $6 million in total. He does not assign a value for each of the three plaintiffs claims individually, nor does he explain, other than by general reference to their testimony, the basis for this significant evaluation. In a very curious comment, Mr. McAtee also says that, even if Judge Cunningham ruled there was no evidentiary basis to submit punitive damages to the jury, "the Plaintiffs will proceed with a Writ of Mandamus requesting the Appellate Court to come in and order that a punitive damage claim be allowed to go to the jury. In all likelihood an Appellate Court would order that the case be allowed to be presented to a jury". At the same time he states his view that punitive damages are not supported by the evidence.

July 11, 2013
Page 25

The demand letter is not an uncommon device used by insured's counsel to put pressure on an insurer to settle a case, although it usually follows an offer to settle made by the plaintiff for a sum within the insurance limits, not the case here. As detailed previously, at the time of the April 5, 2006 letter, GAIC had not received any significant evidence of the plaintiffs' damages or of UP's property damages from McKechnie or BCC. Despite Mr. McAtee's thorough involvement in the case, he also did not provide any documentation with his letter regarding damages.

Finally, although he disclaimed the belief that punitive damages were supportable, Mr. McAtee makes the conclusory statement that an "Appellate Court" would order Judge Cunningham to submit punitive damages to the jury, even if Judge Cunningham, a well respected district judge, determined the evidence was insufficient to do so. In 37 plus years of trial practice and dozens of trials with punitive damages at issue, I have never seen a plaintiff apply for a Writ of Mandamus to the Supreme Court (the only appellate court in which the application can be made) to force the trial court to submit punitive damages to the jury. The reason, I suspect, is that a ruling of this sort, whether pursuant to a motion in limine, motion for partial summary judgment, a demurrer to the evidence, a motion for directed verdict, or an objection to a jury instruction, is simply not a proper subject of an extraordinary writ. That is, a plaintiff has an adequate remedy if a trial court refuses to submit an element of damages to the jury – an appeal. Mr. McAtee's commentary on punitive damages and a Writ of Mandamus also failed to disclose that a party applying for an extraordinary writ must show there is not an adequate remedy and the judge has exceeded his lawful authority. Moreover, the letter does not point out that any application

July 11, 2013
Page 26

for an extraordinary writ must be filed no later than ten days "prior to the date said cause is set for hearing or trial" (with the exception of habeas corpus). See S.Ct. R.1.191(i), 12 O.S. Ch. 15 Appx. 1. Given these limitations on a writ of mandamus proceeding, Mr. McAtee's comments were purely speculative but intended to support his demand for an offer of the combined policy limits.

Biondo did immediately respond to the McAtee April 5, 2007 letter, advising him that, despite repeated requests, "GAIC has not received any substantive damage information" (GAIC 0375). BCC and GAIC also did not offer their combined limits of insurance to the plaintiffs and UP within the ten day period demanded in Mr. McAtee's letter. For reasons to be discussed in the next section, it is my opinion that GAIC had no obligation to even enter into negotiations, much less tender the insurance limit of its policy, at the time the April 5, 206 demand was made.

Biondo noted, as I have, that the April 5, 2007 demand letter did not contain any reference to a settlement demand which had previously been made by the plaintiffs or UP and "no facts to support" the punitive damage claim, and that "additional discovery [is] necessary to determine if payment of limits is reasonable" (GAIC 0190). On April 11, 2007, GAIC did retain counsel to monitor the case (GAIC 0189). This is a standard and proper procedure authorized by the policy which is used by excess insurers to get or stay informed about a case. The Commercial Umbrella Policy expressly authorized this monitoring when the excess insurer has no contractual obligation to defend the insured.

July 11, 2013
Page 27

See COMMERCIAL UMBRELLA COVERAGE FORM § III.D in the Commercial Umbrella Policy, GAIC 0035. Kevin Taylor of Snell and Wilmer was retained by GAIC.

Biondo instructed Taylor to request that McKechnie put the plaintiffs under surveillance as it appeared to her their injuries were being exaggerated. This appears to have been an opinion formed after Biondo received "medical information" on the plaintiffs which she reviewed on April 12, 2007. She notes that Smith suffered a fracture of the twelfth thoracic vertebrae "without obvious spinal cord injury", for which the treatment was surgery to fuse the spine in the area of the fracture. Smith also had bladder and urinary tract problems and was "wheelchair bound" (GAIC 0186). It was later determined that Smith in fact was not confined to a wheelchair because he could not walk, but he chose to sit in a wheelchair when he was tired, and he was able to drive a vehicle without making any adjustments which are normally made for a wheelchair bound driver. Biondo noted that Smith's medical expenses submitted were $147,410.00.

The records of Albert Guerrero indicated he spent two days in a hospital with a diagnosis of muscle strain and abrasions. However, on June 29, 2006 he had a laminectomy with fusion at the area of the spine called L5/S1, on the basis of diagnosed "spondylosis and spinal stenosis with radiculopathy", followed by physical therapy. As of December 13, 2006 Guerrero's doctor concluded he was eligible to return to work at "light duty" but "vocational retraining" is probably needed "since likely restrictions preclude required duties at RR". As of January 24, 2007, the last date in the Guerrero records Biondo recorded on this date, Guerrero had mild and intermittent back pain which is

July 11, 2013
Page 28

"activity related". He was continued on light duty status, although neither he nor the other plaintiffs ever returned to work for UP or anyone else after the accident. Guerrero's submitted medical expenses were $135,637.00.

The third plaintiff, Steve Ramsey, had submitted medical expenses of $45,894.00. A record of January 8, 2007 stated he had "cervical facet joint dysfunction treated with corticosteroid injections". Biondo also reviewed a report of a Dr. McCoin, presumably an economist, who opined that Ramsey would lose in excess of $1.6 million in future earnings plus he would lose the value of "household services" of $35,704.00, for a total of $1,769,700.26, as a result of "cervical facet joint dysfunction, preventing him from gainful employment" (GAIC 0184).

On April 16, 2007 BCC advised McAtee and Biondo that it "is prepared to offer the $1 million limits [sic] of liability...to Union Pacific for settlement of that claim" or, if SRM and GAIC preferred, BCC would tender the $1 million limit to them to use in settlement negotiations with UP as well as the plaintiffs (April 16, 2007 Robert Naifeh letter, GAIC 0383).[10] This letter also states that "Bituminous evaluates the property damage claim of Union Pacific, and the bodily injury claims..., as having a combined value in excess of" the BCC $1 million limit of insurance, and, in fact, evaluated UP's property damage claim alone as having a value in excess of the $1 million limit of insurance. The letter concludes by stating, correctly, that BCC will continue to defend SRM until the BCC limit of

---

[10] On April 18, 2007, after the date of the BCC tender letter, McKechnie emailed McAtee to confirm that, to his knowledge, BCC had not offered its policy limit (McAtee depo. exh.). Of course, it had as the April 16, 2007 Naifeh letter discussed in the text indicates.

insurance is "used in the payment of any judgment or settlement", at which time BCC "will no longer be obligated to defend or indemnify Schwarz...." (GAIC 0384). Mr. Naifeh was certainly correct because, as is typical, the BCC policy's defense clause expressly provides that the duty to defend ends only when the limit of insurance "has been exhausted by payment of judgments or settlements", not by the offer of the insurance limit. See BUSINESS AUTO COVERAGE FORM § II.A in the Commercial Auto Policy (GAIC 0117).

A tender letter by a primary insurer is not uncommon and, in fact, is routine in any case in which the primary insurer is, for whatever reason, willing to pay its limit of insurance. There are situations, with which I am familiar, in which primary insurers will actually tender the limit of insurance, notwithstanding they do not value the claim as exceeding the limit of insurance. The reason for doing this is to attempt to shift the cost of defending the case onto an excess insurer, even though standard liability policies, like the BCC policy, expressly condition the termination of the duty to defend on the exhaustion of the limit of insurance by payment of judgments or settlements. The primary insurer hopes that the excess insurer will treat the tender of a primary limit as the equivalent of a payment, in order to trigger the excess insurer's duty to defend or, at the very least, that the excess insurer will exercise its discretion to take over the defense of the case. In situations with which I am familiar, excess insurers will take over the defense of a case, even at their own expense, before the primary insurance limit is paid, if they suspect that the primary insurer does not have sufficient motivation to conduct a proper defense of the case. This lack of motivation typically will exist, if at all, because the claims personnel for the primary

insurer think, in the back of their minds, that the limit of insurance of the primary policy is going to be paid out eventually, so why spend a lot of time and money on thoroughly investigating and aggressively defending the case. While this is an approach fraught with potential adverse consequences for a primary insurer, it is not one with which experienced defense lawyers and claims personnel are familiar (although I believe primary insurers today are much less likely to engage in such conduct).

On the same date as the BCC tender, Biondo spoke with Taylor, the monitoring counsel, who expressed his "experience is railroad workers have totally unnecessary surgeries, exaggerate claims" (GAIC 0183). Biondo spoke to Taylor again on April 18, 2007 (GAIC 0182) about a lengthy conversation she had had with McKechnie. According to Biondo, McKechnie still had not received the UP damage documentation and was suggesting to Biondo a possible contributory negligence defense to the UP claim, based on the theory that, if the train had been traveling slower, say at 36 mph, Phillips would have had an extra 1/3 second to travel fifteen to eighteen feet in order to clear the tracks, provided the train brakes had been applied sooner (Id.). I find nothing in the materials I reviewed to suggest that this theory was further developed, and it would certainly take a qualified accident reconstructionist to do so. I am not aware that such an expert was retained by Mr. McKechnie or by BCC.

On April 18, 2007, GAIC declined BCC's tender (GAIC 0389, Biondo-Naifeh letter). In the April 18, 2007 conversation between Biondo and Taylor she told him to obtain all of McKechnie's file material to evaluate damages. As it turned out, Taylor had extreme

difficulty obtaining a copy of McKechnie's file, despite repeated requests and offers to assist Mr. McKechnie in organizing his file so it could be copied. *See e.g.,* May 25, 2007 Taylor-McKechnie email advising a copy of the file had still not been received despite numerous requests for it. (GAIC 0397). On April 18, 2007 GAIC, through Biondo, rejected the tender of BCC and confirmed its understanding that BCC would continue to provide the defense of SRM (GAIC 0389). Biondo also again recommended that the defense conduct medical exams of the plaintiffs, retain vocational rehabilitation and economics experts, and possibly an accident reconstructionist. These requests are actually those which McKechnie had previously recommended. Biondo also again advised that she still had not received documentation of UP's property damage.

On April 26, 2007 Taylor advised Biondo that Mr. McAtee was unhappy with BCC's appointed counsel, McKechnie, and did not want him trying the case for SRM (GAIC 0394). Mr. McAtee testified he was concerned that McKechnie was not able to properly prepare and try the case alone, and that he was concerned about the deposition preparation McKechnie had done with SRM witnesses, as well as with the initial brief on the preemption issue which McKechnie had prepared. In an email of May 16, 2007 to Biondo (GAIC 0395-96), McAtee suggested that new lead counsel be substituted for McKechnie on the basis that he could not do all of the work and should not be lead counsel. McAtee also renewed the previous April 5, 2007 demand that GAIC tender its insurance limit. In response to McAtee's request for a change in lead counsel, Biondo advised him that the decision was up to BCC as it was providing the defense (GAIC 0395, May 17, 2007 Biondo-McAtee email). Although I don't see any documentation that some agreement was

reached concerning who would be lead counsel and who would actually try the case, Kevin Taylor and associates did enter an appearance for SRM in early June, 2007. Presumably, this decision was made in response to the request and criticisms made by Mr. McAtee.

McKechnie sent an April 30, 2007 letter (GAIC 1291) which provided his updated liability (but not damages) assessment. His bottom line was that the case should be considered as one of 100% liability on SRM, despite other comments in the letter that, if the court ruled against preemption, the range of possible UP negligence could be as high as 20% (but also could be 0%). The letter does not discuss UP's potential liability to plaintiffs on the FELA claim, even though the standard of causation for FELA negligence claims is closer to a contributing cause standard than the common law proximate cause standard, and even though pure comparative negligence applies in a FELA case, meaning a plaintiff can recover even if the railroad is only 1% at fault.

By letter dated May 22, 2007 McKechnie finally transmitted the UP bill of costs documenting UP's property damages (GAIC 0689 – the year of the letter is 2006, obviously a typographical error – see also June 18, 2007 Biondo file entry, GAIC 0173). The documentation showed total expenses of $2,132,192.48. McKechnie subsequently provided a report from his train damage expert, Nelson, which significantly discounted the bill of costs to $744,888.00 (July 13, 2007 McKechnie letter, GAIC 1014, and Biondo file entry of July 17, 2007, GAIC 0170).

July 11, 2013
Page 33

On June 22, 2007 "JS" at GAIC commented that the $1 million reserve remained adequate pending receipt of additional information (GAIC 0172 – at the time of this note GAIC had not received a report of the defense train damage expert, Nelson, which was submitted with McKechnie's July 13, 2007 letter described above). On July 2, 2007 Taylor advised Biondo that the Phillips wrongful death claim had been settled with UP (GAIC 0171). He also advised that medical examinations were being scheduled for the plaintiffs. In fact, it does not appear these were scheduled until a week prior to the mediation.

At least by July 5, 2007, it appears from exhibits to the McAtee deposition and his testimony the sale of SRM and related entities for approximately $70 million (about which GAIC had no knowledge until the August 30, 2007 mediation), was going to include an "escrow" to set aside cash to pay a judgment in *Smith v. SRM* should a judgment exceed the combined policy limits. This appears to have been requested by the buyer, Boral, an Australian company. A July 26, 2007 email from a lawyer at Alston and Bird in Atlanta, representing Boral, confirms that the sale is to close a week from a scheduled conference call set for July 27, making the closing August 3, 2007. Handwritten notes of Mr. McAtee produced at his deposition, as well as his testimony, suggest hardnosed negotiations occurred over the amount of the escrow which SRM was able to get substantially reduced. It also appears an additional escrow may have been created for other possible post-closing costs. It does appear the sale closed in early August, 2007.

On July 25, 2007 Taylor advised Biondo that a mediation had been proposed for August by McAtee, using John Rothman as the mediator (GAIC 0169). In fact, it appears