**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 25, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

SRM, INC.,

    Plaintiff - Appellant,

v.

No. 14-6160

GREAT AMERICAN INSURANCE
COMPANY,

    Defendant - Appellee.

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:11-CV-01090-F)**

_____

Maurice G. Woods II (Michael G. McAtee, with him on the briefs),  McAtee & Woods, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Roger N. Butler, Jr. (Diane M. Black, with him on the brief), Secrest, Hill, Butler & Secrest, Tulsa, Oklahoma for Defendant-Appellee.

_____

Before **HARTZ**, **HOLMES**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Under Oklahoma law, a primary insurer owes its insured a duty to initiate

settlement negotiations with a third-party claimant if the insured's liability to the

claimant is clear and the insured likely will be held liable for more than its insurance

will cover. Here the insured, SRM, Inc., seeks to extend this obligation to its excess liability insurer, Great American Insurance Company. Specifically, SRM claims that Great American breached its insurance policy and duty of good faith and fair dealing by not proactively investigating claims against SRM and by refusing to tender its policy limits to spur settlement negotiations. The district court granted Great American's motion for summary judgment on SRM's claims and denied SRM's request to reconsider. We agree that Great American—SRM's *excess* insurer—did not breach its duty to fairly and in good faith discharge its contractual obligations to SRM. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

At a rail crossing in rural Canadian County, Oklahoma, a Union Pacific Railroad train t-boned an SRM[1] dump truck as the truck crossed the tracks in the path of the oncoming train. The collision killed the truck driver and derailed the train causing extensive damage to the train's engines, its cars, and three of its workers.

The three injured train workers sued Union Pacific, SRM, and SRM's primary auto liability insurer, Bituminous Insurance Company, in state court. Union Pacific cross-claimed against SRM and SRM counter cross-claimed. As SRM's excess liability insurer, Great American received notice of the claims and monitored the case for potential exposure under its umbrella policy.

---

[1] At the time, SRM, Inc. was Schwarz Ready Mix, Inc. SRM is Schwarz's successor. We use "SRM" to refer to both Schwarz and SRM.

As SRM's primary insurer, Bituminous defended SRM in the state action. At the outset, SRM's defense team estimated potential damages to be $4.2 million and settlement value to be $2.25 million, with no chance for a defense verdict.

About a year after the incident, SRM's attorney Mike McAtee, whom SRM separately retained, demanded that Bituminous and Great American tender their respective liability policy limits to settle the case. He asserted that the injured train workers' claims alone would exceed the $6 million in combined liability coverage. Bituminous responded that it was prepared to offer its $1 million liability limit to Union Pacific to settle that claim, or to tender its limit to SRM and Great American for their use in negotiating a settlement with Union Pacific and/or the other claimants. But Great American rejected that approach and urged an aggressive defense.

After a pretrial hearing at which the trial court indicated that federal law preempted SRM's cross-claim and best defense, McAtee renewed his demand that Great American tender its $5 million policy limit to settle the case. He warned that any delay in tendering the entire $6 million available for settlement might make it impossible to settle at a later date. Great American again declined, stating it required additional discovery to properly evaluate the claims and suggesting the claims would be resolved in mediation after discovery was complete.

Before mediation, SRM's Bituminous-retained defense team revised its estimate of potential exposure to be between $4-4.5 million and $7 million. A Great

American-retained attorney estimated economic damages at roughly $8 million, but estimated a jury would award between $2 and $4.65 million.

At the mediation, the plaintiffs initially demanded $20 million but later in the day reduced their demand to $6.5 million. Great American countered with $450,000. At that point, over Great American's objection, McAtee disclosed to the plaintiffs that SRM stood ready to contribute $500,000 in addition to the $6 million policy limits to settle the case. A week later, the case settled for $6.5 million with the parties agreeing to pay as follows: Bituminous, $1 million; Great American, $5 million; and SRM, $500,000.[2]

After the dust settled on the underlying litigation, SRM sued Great American in state court as part of a second round of litigation involving multiple other parties and claims. Following some procedural wrangling, the state court severed SRM's claims against Great American, creating this independent action, which Great American removed to federal court.

In this suit, SRM alleged that Great American breached its excess liability insurance contract and the implied covenant of good faith and fair dealing by failing to proactively investigate the railroad's and railroad workers' claims, and failing to initiate settlement negotiations. The district court granted Great American's summary judgment motion, concluding, among other things, that Great American did not owe

---

[2] Eugene Schwarz, one of the three Schwarz brothers operating SRM, testified at his deposition that SRM had its own reasons for settling the case quickly—the lawsuit apparently was holding up a $70 million deal to sell SRM to an Australian company that was not interested in purchasing the potential liability SRM faced in the underlying litigation.

SRM a duty to investigate or to initiate settlement negotiations until Bituminous tendered its policy limits at the time of settlement.

Citing new evidence and asserting a new legal argument, SRM sought reconsideration of the district court's ruling. SRM contended that because the common law implies an independent duty of good faith and fair dealing, the district court erred in linking that duty to Great American's contractual obligations. The district court also rejected this argument, reiterating that Great American had no implied duty to investigate claims or to initiate settlement negotiations until Bituminous exhausted its policy limits by paying claims. SRM appeals.

## DISCUSSION

SRM blames Great American—its excess insurer—for forcing SRM to pay $500,000 out-of-pocket to settle Union Pacific's and its injured workers' claims. SRM argues that if Great American had investigated the claims and initiated settlement negotiations by tendering its policy limits earlier in the litigation, the case would have settled within the $6 million policy limits. SRM further contends that Great American's failure to take these actions violated Great American's implied duty of good faith and fair dealing.[3]

---

[3] SRM's appellate arguments present a moving target. In its opening brief, SRM did not challenge the district court's interpretation of the Great American policy—that Great American unambiguously owed SRM no contractual duty to investigate, settle, or defend until after Bituminous had exhausted its policy limits by paying claims. But in its reply brief and again at oral argument, SRM argued the policy was ambiguous or unenforceable. *See, e.g.*, SRM Reply Br. at 2-3 (arguing policy was basically illusory and contrary to SRM's reasonable expectations, requiring Great American to do nothing to settle claims while tying SRM's hands to

Under Oklahoma law, which we apply to this diversity action, primary insurers like Bituminous generally are immediately responsible for investigating and defending the insured against third-party claims. *See U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Co.*, 286 F.3d 1216, 1217 & n.1, 1218 (10th Cir. 2002) (noting that primary insurer provides insured "'immediate coverage'" (quoting *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001)). In performing its contractual obligations a primary insurer owes its insured a duty of good faith and fair dealing. *See Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977) (quoting *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1038 (Cal. 1973)).

This implied duty includes "an affirmative duty to initiate settlement negotiations" if "an insured's liability is clear and injuries of a claimant are so severe that a judgment in excess of policy limits is likely." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1095 (Okla. June 21, 2005), as corrected, (June 22, 2005). In addition, any settlement decision must be "based on a thorough investigation of the underlying circumstances of the claim." *Id.* But Oklahoma courts have yet to decide how this duty applies to an excess insurer like Great American, whose contractual

---

settle claims); SRM Reply Br. at 4-5 (arguing Great American should be estopped from taking the position that it had no obligation to investigate claims against SRM because Great American did in fact investigate claims and participate in controlling settlement negotiations; contending that once Great American began investigating the claims it had an obligation to do so reasonably, which it did not do). We decline to consider these arguments. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

duties to the insured are not triggered until the primary insurer's policy limits have been exhausted. Our task is to predict how the Oklahoma Supreme Court would decide this question. *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 875 (10th Cir. 2013).

In doing so, we review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1236-37 (10th Cir. 2012). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Artes-Roy v. City of Aspen*, 31 F.3d 958, 961 & n.5 (10th Cir. 1994). We review for abuse of discretion the district court's denial of SRM's motion to reconsider under Fed. R. Civ. P. 59(e). *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (finding no abuse of discretion when district court's grant of summary judgment affirmed under de novo review).

To determine Great American's obligations to SRM, we start with the terms of the policy itself. *Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co.*, 720 F.3d 798, 804 (10th Cir. 2013). If a policy is not ambiguous, the plain language controls. *See Yaffe Cos. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1185 (10th Cir. 2007).

The "Coverage" section of SRM's excess insurance policy states that Great American "will pay" when SRM "becomes legally obligated to pay by reason of liability imposed by law . . . because of 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' that takes place during the Policy Period and is caused

by an 'occurrence' happening anywhere." Great Am. Policy § I, Doc. 69-4 at 33. The parties agree that the policy covered the train derailment and resulting property damage and personal injuries.

The Great American policy represents a classic excess insurance policy: the policy limited Great American's responsibility for damages to "that portion of damages . . . in excess of the 'retained limit.'" *Id.* § II.G., Doc. 69-4 at 34. In this case, the applicable "retained limit" equaled "the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying insurance and the applicable limits of any other insurance providing coverage to the 'Insured' during the Policy Period." *Id.* § II.G., Doc. 69-4 at 34. That is, Great American would pay for covered claims exceeding Bituminous' $1 million policy limit.

Consistent with this coverage obligation, the "Defense" section of the policy gave Great American "the right and duty to investigate any 'claim' and defend any 'suit' seeking damages covered by the terms and conditions of this policy when" at least one of two conditions was met: (1) the "Limits of Insurance" of "any other insurance providing coverage to the 'Insured'"—here, Bituminous' $1 million primary insurance limit—"have been exhausted by actual payment of 'claims' for any 'occurrence' to which this policy applies," *id.* § III.A., Doc. 69-4 at 34; or (2) "damages are sought for any 'occurrence' which is covered by this policy but not covered by any . . . other insurance providing coverage to the 'Insured,'" *id.*

8

The policy specifically reiterated that unless primary insurance limits were exhausted or SRM faced a claim not covered by a primary insurer's policy, Great American would "not be obligated to assume charge of the investigation, settlement or defense of any 'claim' or 'suit' against the 'Insured.'" *Id.* § III.D., Doc. 69-4 at 35. Great American retained, however, "the right and . . . the opportunity to participate in the settlement, defense and trial of any 'claim' or 'suit' relative to any 'occurrence' which, in [its] opinion, [might] create liability on [its] part under the terms of this policy." *Id.* The policy also required SRM to obtain Great American's consent before making any payment or entering any settlement for which SRM would seek reimbursement from Great American. *See id.* §§ VI.F.4., VI.H., Doc. 69-4 at 44.

As the district court correctly concluded, the policy was unambiguous: Great American's contractual duties to investigate, settle, or defend claims against SRM did not kick in until SRM's primary insurer exhausted its policy limits by actually paying claims. This did not happen until Bituminous and Great American simultaneously paid their respective policy limits to settle the claims against SRM. *See id.* § III.A., Doc. 69-4 at 34; *Steadfast Ins. Co. v. Agric. Ins. Co.*, 304 P.3d 747, 750 (Okla. 2013); *U.S. Fid. & Guar. Co.*, 37 P.3d at 833; 14 Couch on Insurance § 200:51. So, at the same time that Great American's contractual duties to SRM took effect, Great American fully discharged its contractual obligations by contributing its policy limits toward settling the case.

But SRM tries to sidestep the policy it agreed to. It argues that because the duty of good faith and fair dealing is an *implied* duty, it is independent of policy

language, and therefore applies equally at all times to all insurers—whether primary or excess—regardless of when an insurer's express contractual duties to the insured kick in.

While the duty of good faith and fair dealing is an obligation "'deemed to be imposed by the law,'" the insurer's duty is to "'act fairly and in good faith *in discharging its contractual responsibilities*.'" *Christian*, 577 P.2d at 904 (quoting *Gruenberg*, 510 P.2d at 1037) (emphasis added). Thus, an insurer's "'duty . . . to the insured to exercise skill, care, and good faith to the end of saving the insured harmless, as contemplated by the [insurance] contract,'" arises when an "'insurance company . . . , pursuant to [a] contract, take[s] control of'" investigating, adjusting claims, and defending lawsuits. *Nat'l Mut. Cas. Co. v. Britt*, 200 P.2d 407, 411 (Okla. 1948) (quoting *Boling v. New Amsterdam Cas. Co.*, 46 P.2d 916, 919 (Okla. 1935)).

"An excess insurer" like Great American "has a reasonable economic expectation that it will not be responsible on its policy until the insurance at the level lower to [it] has been exhausted in accordance with the express provisions and obligations in the insurance contract." *Steadfast*, 304 P.3d at 750. Likewise, "the duty of an excess insurer to participate in the insured's defense is triggered only by exhaustion of the primary policy," even if the "claim against the insured is for a sum greater than the primary coverage." *U.S. Fid. & Guar.*, 37 P.3d at 833.

Under its policy with SRM, Great American had no obligation to investigate, settle, or defend a claim until the primary insurer exhausted its policy limits by paying claims. It would be inappropriate for us to alter Great American's obligations

or economic expectations, which are rooted in the unambiguous terms of its contract with SRM. *See id.* (noting that requiring excess carrier to pay for defense because claim exceeded primary coverage would have been "contrary to . . . policy's provisions" and would have "reallocated risks . . . the parties had freely agreed to and [were] compensated to assume").

SRM cites no controlling authority for its position that excess insurers owe their insureds a duty to proactively investigate and initiate settlement negotiations by tendering their policy limits even before the policy requires them to take such actions. And none of the extra-jurisdictional cases it does cite concern the type of duty SRM seeks to impose on Great American in this case—to proactively investigate and initiate settlement negotiations contrary to unambiguous policy terms. *See, e.g.*, *Am. Alt. Ins. Corp. v. Hudson Specialty Ins. Co.*, 938 F. Supp. 2d 908, 917 (C.D. Cal. 2013) (holding that primary insurer could maintain equitable subrogation claim against excess insurer for unwarranted costs when primary insurer was forced to continue to defend insured because excess insurer rejected reasonable, within-limits settlement offers); *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 277 Cal. Rptr. 906, 916 (Ct. App. 1991) (holding that excess insurer might be liable for portion of settlement that exceeded primary limits but was within excess limits when excess insurer rejected within-excess-limits settlement demand); *Kelley v. British Commercial Ins. Co.*, 34 Cal. Rptr. 564, 569 (Dist. Ct. App. 1963) (holding that excess insurer was liable for over-limits judgment when it rejected pre-trial within-limits offers); *N. Am. Van Lines, Inc. v. Lexington Ins. Co.*, 678 So. 2d 1325,

1333-34 (Fla. Dist. Ct. App. 1996) (holding that excess insurer may be liable for insured's out-of-pocket payment to settle case when excess insurer refused reasonable within-limits settlement offers).

At most, these cases recognize that an excess insurer owes its insured a duty to act reasonably when evaluating a plaintiff's settlement offer or a settlement agreement negotiated by the primary insurer. But here, the railroad and its workers made no settlement offers or demands until the mediation—just a week before Great American paid its policy limits to settle the case. And SRM's primary insurer did not negotiate a settlement that Great American refused to join.

Although the facts of the cases SRM cites vary, as do the legal questions they address, each of the cases involved an excess insurer that exposed its insured or a primary insurer to liability by rejecting within-limits settlement offers. Under those circumstances courts have held that excess insurers owe their insureds a duty to "exercise good faith . . . *in considering any offer of compromise* within the limits of [their] polic[ies]." *Kelley*, 34 Cal. Rptr. at 569 (emphasis added). Others have held more broadly that excess insurers owe their insureds a "duty of good faith in *evaluating any settlement offers*" coupled with a duty not to "arbitrarily reject a reasonable settlement." *N. Am. Van Lines*, 678 So. 2d at 1333-34 (relying heavily on *Diamond Heights*, 277 Cal. Rptr. at 916) (emphasis added).

These duties may require an excess insurer to consider various factors, including the maximum likely recovery at trial, costs of defense, and the burdens of trial "*in evaluating the reasonableness of a settlement negotiated by the primary*

insurer." *Diamond Heights*, 277 Cal. Rptr. at 916 (emphasizing that an "excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement") (emphasis added). And "if an excess insurer, like a primary insurer, *fails to accept a reasonable settlement offer within its policy limits*, it may be liable to the other insurer for any excess liabilities" under a claim for equitable subrogation. *Am. Alternative Ins. Corp.*, 938 F. Supp. 2d at 917 (emphasis added).

But these cases do not suggest that an excess insurer must investigate, initiate settlement negotiations, or proactively tender its policy limits in the face of an unambiguous policy to the contrary and absent any settlement demand from the plaintiffs or proposed settlement agreement from the primary insurer. Yet that is exactly the burden SRM asks us to impose on Great American. We decline to do so. *See* 14 Couch on Insurance §§ 200:41 & 42 (noting that excess insurers are not obligated to participate in defense of insured until primary policy limits are exhausted, even if claim amount exceeds primary limits).

Even assuming the Oklahoma Supreme Court would follow the approach taken in the out-of-state cases on which SRM relies, Great American would be entitled to summary judgment. Unlike the excess insurers in those cases, Great American did not arbitrarily reject or otherwise fail to consider and evaluate a reasonable, within-limits settlement offer. Until the mediation, discovery remained ongoing and settlement negotiations had not begun: Great American had no settlement offers to consider, and even at mediation none of the offers were within policy limits. But once the plaintiffs placed the $6.5 million offer on the table and SRM offered to

contribute $500,000, Great American promptly contributed its $5 million policy limit to settle the litigation a week later.

Granted, Oklahoma's duty of good faith and fair dealing requires *primary* insurers to do "more than . . . simply not refus[e] unconditional settlement offers within [its policy] limits." *Badillo*, 121 P.3d at 1095. "[I]f an insured's liability is clear and the injuries of a claimant are so severe that a judgment in excess of policy limits is likely," a primary "insurer has an affirmative duty to initiate settlement negotiations." *Id.* (citing *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. Dist. Ct. App. 1991)). But SRM has provided no basis for overriding the unambiguous terms of its excess insurance policy and extending this type of duty to Great American—an excess insurer—before Great American's contractual obligations to investigate, settle, or defend kicked in. *See Noonan v. Vt. Mut. Ins. Co.*, 761 F. Supp. 2d 1330, 1332, 1335 (M.D. Fla. 2010) (holding that excess insurer had no obligation to insured until primary insurer offered its policy limits to settle claim against insured). Accordingly, we affirm the district court's grant of summary judgment in favor of Great American and its denial of SRM's motion to reconsider.[4]

---

[4] The court does not reach the district court's alternative ruling that Great American would be entitled to summary judgment even if it owed SRM a duty to proactively investigate and initiate settlement negotiations before the mediation. We therefore need not decide the related questions of whether the district court erred in disregarding certain affidavits or in excluding various depositions that SRM relied on to support its argument that the case would have settled within the $6 million policy limits if Great American had made proactive efforts toward settlement earlier in the litigation.